NASHVILLE,....................DECEMBER TERM, 1872.

## W. M. ALEXANDER *v.* JAMES C. KELSO.

1. EXECUTOR. *De son tort. What constitutes.* Where a party assumes to intermeddle with goods of which an intestate died possessed, he renders himself liable, by such act, as executor *de son tort.*

   If A deposits money with B to be kept by him for A, and he does keep it until A's death, and then pays over to the widow and creditors of A the money so kept, such a state of facts will make B liable, as executor *de son tort* of A. But if A lends B money, it becomes the property of B, and a payment of the same to the widow or creditors of A, after his death, can not render B liable as executor of his own wrong.

   Cases cited: Bacon's Abridgement, vol. 4, 26, Bouvier's edition; Williams on Executors, vol. 1, 225: Bacon's Abridgement, vol. 4, 28; 2d Durnford & East, 97.

2. FRAUD. Facts bearing upon questions of fraud can be looked to only to determine the ownership of the money.

3. WITNESS. *Party of record. Competent. When.* The act of Feb. 24, 1870, excluding the testimony of either party, as to trans-

W. M. Alexander *v.* James C. Kelso.

actions with, or statements by a testator or intestate, applies only to actions by or against rightful personal representatives, and has no application to a suit where a party is sought to be held as executor of his own wrong.

### FROM LINCOLN.

Appeal in error from the judgment of the Circuit Court, W. P. HICKERSON, Judge.

J. W. NEWMAN and E. L. ALLEN for plaintiff in error.

W. F. KERCHEVAL, BRIGHT & SONS and COOPER for defendant in error.

BURTON, Special Judge, delivered the opinion of the Court.

In this action the plaintiff in error sued the defendant in error in the Circuit Court of Lincoln County, on two notes; one for $3,500, dated October 4, 1862, the other for $3,000, dated May 20, 1863, both due one day after date, and made payable to the plaintiff by one Henry Kelso. The defendant was declared against as the *executor* of said Henry. The defendant pleaded various pleas, the only one of which that need be specially noticed is the second one, whereby he pleads in the most formal and particular manner that he was never executor of the said Henry Kelso. The plaintiff replies to this plea that defendant was executor of his own wrong of the goods, etc., of the said Henry Kelso, and this is the principal issue in the case. The plaintiff insists that errors were committed by his Honor the Circuit Judge, to his preju-

dice, both in the instructions given to the jury and in the admission of evidence.

It appears from the evidence in the bill of exceptions that Henry Kelso died September 6, 1866. It also appears that some short time before the death of said Henry he put into the hands of the defendant, James C., about $4,000 in gold. It also appears that some short time after the death of Henry Kelso, the defendant paid $300 to his father, Jefferson Kelso, the amount of a note due him from Henry, and on which defendant was surety. And about the same time defendant paid to Rebecca Kelso about $4,100. Different theories are maintained by plaintiff and defendant respectively, as to the character in which the $4,000 was in the hands of the defendant, James C. Kelso, one insisting that the money was placed in his hands by Henry Kelso to be paid over, and which he did pay over to his widow Rebecca after his death. The other that the defendant borrowed the money from said Henry, promising him that he would pay it over to his widow in the event of his death. And there is, no doubt, some proof in the record tending to support each of these views. Mrs. Rebecca Kelso, the widow of Henry, is examined, and proves in substance, that after the husband's death the defendant paid her $4,000 or $4,100, which she understood him to say belonged to Henry Kelso, and she thinks she also heard defendant say he paid the $300 to Jefferson Kelso out of money belonging to Henry. On cross-examination Mrs. Kelso states that when defendant paid her the money he told her

that it was the money he had borrowed from her husband, and in regard to the $300 paid to Jefferson Kelso, he said he paid it because he was surety. The defendant, James C.,- offered his own evidence in the cause. He states distinctly that he borrowed the $4,000 in gold from Henry Kelso, which he invested in mules and bacon, and that he paid both of the debts so often referred to with money that he obtained on a re-sale of the mules and bacon.

Under this state of facts, his Honor, Judge Hickerson, told the jury, in substance, that if Henry Kelso deposited money with the defendant to be kept by him for said Henry, and he did so keep it until after Henry's death, and then paid over to the widow and Jefferson Kelso the money so kept, that such a state of facts would make him liable to the plaintiff as executor *de son tort* of Henry Kelso.

On the other hand, his Honor told the jury that if Henry Kelso loaned the defendant the money, and defendant received it as his own to be used as his own, and defendant expended the money in bacon or mules, or otherwise expended the money so borrowed, "And after the death of Henry Kelso he paid a portion of the amount so due from him to Henry Kelso over to his widow, and the balance to Jefferson Kelso on a note due to him from Henry Kelso, deceased, or paid it all over to the widow of Henry Kelso, although such payment would not have been lawful or valid as a payment of his debts to Henry Kelso, deceased, still it would not and could not make him liable as execu-

tor *de son tort.* For, under such a state of facts, if they exist, the money paid out was his own and not the money of Henry Kelso's estate."

We have carefully examined this charge, and certainly find nothing in it of which the plaintiff has any right to complain. Our doubt is, whether his Honor did not state the law too strongly against the defendant in explaining to the jury the acts that would make him liable as executor of his own wrong.

In Bacon's Abridgement, vol. 4, 26, Bouvier's edition, it is said: "An executor *de son tort* is a person who, without any authority from the deceased or the Ordinary, does such acts as belong to the office of an executor or an administrator." In Williams on Executors, vol. 1, 225, it is said, if one who is neither executor or administrator intermeddles with the goods of the deceased, or does any other act characteristic of the office of executor, he thereby makes himself what is called in the law an executor of his own wrong, or more usually an executor *de son tort.*

A very slight circumstance of intermeddling with the goods of the deceased will make a person executor *de son tort.* Thus it is said in Dyer in margin, that milking the cows even by the widow of the deceased, or taking a dog, will constitute an executorship *de son tort.* So in one case the taking a bible, and in another a bedstead, were held sufficient, inasmuch as they were the indicia of the person so interfering being the representative of the deceased. In the books first quoted, authorities are cited for the posi-

tion that an intermeddling for which there is a colorable right will not make a wrongful executorship. Bac., Ab., vol. 4, 28. From these authorities, it is manifest that it is the intermeddling with goods of which the intestate died possessed, or the owner, that constitutes a wrongful executorship. And this principle and distinction is clearly taken in the instructions given to the jury in this case.

If Henry Kelso loaned this money to the defendant in his lifetime, to be used as he saw proper, and as his own money, it is very plain that the title and property in the gold passed to the defendant in the life-time of Henry Kelso, and could not be of the goods of his estate at the time of his death, and the whole effect of the transaction was, that Henry, from the time of the loan became debtor to the deceased.

The case of *Padget and another* v. *Priest & Porter* is so confidently relied upon, that it is thought due to counsel to notice it; at the trial the plaintiffs prove the delivery of the goods in question to W. Shore, as whose executors of their own wrong the defendants were held liable. A few days previous to his death the intestate sent to Porter, his brewer, desiring him to send a man to take charge of the cellar and to draw the beer, who sent Payne, his servant. Payne sold beer as well after the intestate's death as before. The intestate likewise ordered Priest to sell some hogs, which he did, after his death, and paid into Porter's hands the produce of them and of the beer which was sold after the death of Shore.

W. M. Alexander *v.* James C. Kelso.

On December 7, 1786, administration was granted to F. Shore, who afterwards brought actions against these defendants for money had and received. On the 3d of February, Priest paid £8, and on the 10th of February Porter paid £41 into Court in those actions. Buller J. said the plaintiff, who were creditors of W. Shore, find Priest and Porter selling his goods, and as they had no means of knowing whether they were lawful or wrongful executors, they looked upon them from their acts in the character of rightful executors. They thereupon brought this action against them as executors. They proved effects of the intestate in their hands, that they sold them after the intestate's death, and that at the time when this action was brought, and even when the defendants pleaded in this action, they had money of the intestate's in their hand: 2d Durnford & East, 97.

The principles of this case, as we understand it, are in accord with the charge of his Honor in the case in hand. It is true that the judges laid much stress upon the fact of the payment of the money into Court by the defendant, and, in fact, they seem to think that the paying the money into Court after action brought against the defendants by the rightful administrator, was a conclusive circumstance against them; but it must be remembered that this payment was made out of money received on the sale of Shore's goods after, as well as before his death, which, of course, made a plain case of intermeddling in the intestate affairs. It is then seen that the payments in

the case at bar have no analogy to those in the case cited; the money paid was not the money of the intestate, Henry Kelso, nor was it derived from the sale of any property that belonged to him at his death, at least if the jury believed the testimony of the defendant.

It is further argued that the Court should have instructed the jury as requested, " that if the payment either to Jefferson Kelso or Rebecca Kelso was made vith a view to defraud the creditors of Henry Kelso, that this would make the defendant liable as executor *de son tort* to the plaintiffs in this action." The Court declined to charge as above; but stated to the jury that the facts bearing on the question of fraud would be looked to only for the purpose of deciding whose money it was that was paid over. We see no error in this action of his Honor. If the money was merely deposited with the defendant, to be kept by him and handed over after Henry Kelso's death to his widow, with the view of keeping it out of reach of his creditors, such a transaction would not pass the title in the property to defendant, but the title would still be in Henry Kelso, and on his death would be goods of his estate. And the paying the money over to any person after his death would be an intermeddling with the effects of the deceased wrongfully. But this is not what his Honor was requested to charge, but the wholly different proposition, that if payments were made with the view of defrauding creditors, it would constitute defendant as wrongful executor, thus ignoring

and losing sight of the important distinction between a payment by the defendant out of his own means, and the disposing of money that belonged specially to the intestate at his death.  This distinction had been kept up correctly by his Honor throughout his charge, and it is in reference to this distinction we understand his direction to the jury that they would look to the circumstances of fraud proven only for · the purpose of determining whose money it was that was paid over. That is, whether the money was still the intestate's in the hands of defendant, or had it been, in fact, borrowed by defendant, so that he was simply a debtor and not a depository of the gold, at the time of Henry Kelso's death.

It is futher argued, that the pleading of other pleas beside *ne unques* executor is an admission by the defendant that he is liable as executor of his own wrong. And it is stated generally that Toller, Williams and Sanders are authorities for this position.   Williams on Executors is the only one of the authors named to which we have had access, and we can not see that this author sustains the point insisted on.

If a party is sued as executor, and omits to plead that he was never executor, but relies upon other defences, of course it would be an admission that he was executor.

But that is not this case.   Here the defendant does plead that he was never executor, and puts in various other pleas in addition thereto.   Now to hold that the defendant, by this mode of pleading, committed him-

self an executor *de son tort*, although no such acts were proven against him as in law constitute an executorship of that kind, is not warranted by any principle we are aware of.

It is said by plaintiff's counsel, though not much insisted on, that it was error to admit the defendant to testify in this case. We think the act of February 24, 1870, excluding the testimony of either party as to transactions with, or statements by a testator or intestate, applies to actions by or against a rightful personal representation, and has no application to a suit where a party is sought to be held as executor of his own wrong.

There is no error in the judgment of the Court below, and it is affirmed with costs.